MICHAEL HINCKLEY, State Bar No. 161645
THE LAW OFFICES OF MICHAEL HINCKLEY
803 Hearst Avenue
Berkeley, California 94710
Telephone:     (415) 706-1386
Email: hinckley@michaelhinckleylaw.com

Attorneys for Defendant
DAMARI SINGLETON

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>         Plaintiff,<br>vs.<br><br>DAMARI WILLIAM SINGLETON<br><br>         Defendant. | Case Nos.  16-518 BLF<br><br>**DEFENDANT DAMARI SINGELTON'S SENTENCING MEMORANDUM & REQUEST FOR VARIANCE**<br><br>Date: September 10, 2019<br>Time: 8:30 a.m.<br>Hon. Beth Labson Freeman |

I. **Introduction**

    Defendant DAMARI SINGLETON ("Singleton") has pleaded guilty to one count of Sex Trafficking of Children, 18 U.S.C. §§ 1591(a) and (b).  The plea was made pursuant 11(c)(1)(A) and 11(c)(1)(B) of the Federal Rules of Criminal Procedure with the parties agreeing to an advisory sentencing guideline total offense level calculation of 31 or 33.  Probation concurs with the calculations and concludes a total offense level of 33 is appropriate.  Probation also concludes Singleton to be Criminal History Category V.  Singleton will explain in this memorandum why he believes his criminal history in the guidelines is overstated and should be adjusted as a factor in mitigation.

    Given the violence, trauma, sexual-abuse and poverty Singleton experienced as a child and teenager, it is sadly not altogether surprising he has had difficulty with the criminal-justice system as a young adult.  He has struggled to come to terms with a childhood that included extensive child abuse,

hunger, being a victim of gun violence, witnessing death and dying, and learning that his putative father was actually not his father at all.

Given Singleton's extraordinarily disturbing childhood, he has recently consulted with psychologist Francis Abueg in order to determine what impact the traumatic events he experienced has had on Singleton's functioning in society as an adult. After his evaluation Dr. Abueg concluded that Singleton is experiencing Post Traumatic Stress Disorder (PTSD) and that as a result, he has poor executive functioning/decision-making abilities.[1] It is clear now that Singleton is a young man in need of help dealing with the impact of the trauma he experienced as a child in order to stop the habitual pattern of suffering.

It is promising that Singleton recognizes that he needs help and is eager to obtain it. As Dr. Abueg reports, Singleton "understood his role in making bad choices and wishes to engage in more substantive treatment." Dr. Abueg reports that Singleton "has been responsive to offers of counseling while incarcerated and found those contacts beneficial" and concludes that Singleton's attitude "bode well for further meaningful responses to treatment."

Singleton fully recognizes that the behavior he engaged in in this case was serious and unacceptable. He is clear that his actions have caused harm to the victim in this case, as well as to his wife and daughter who will be separated from Singleton for an extended period of time as a result of his actions. He stands ready to accept the penalty for his actions in this case, and also hopes that he will be able to return to his family in the future and make a positive impact in the upbringing and care of his young daughter. Probation has recommended that the Court impose a below guidelines custodial term of 144 months. Singleton agrees that a below guidelines sentence is appropriate here, but for the reasons set

---

[1] Dr. Abueg assessed Singleton for PTSD. He concluded that several traumatic events in Singleton's life (molestation, witnessing the mortal illness of his father, being shot, etc.) constituted traumatic stressors pursuant to DSM-5.

forth below he requests a sentence of 120 months. A sentence of 120 months is very stiff and would be "sufficient but not greater than necessary" to achieve the purposes of sentencing.

## II.     The Offense

The offense conduct is set forth in detail in the PSR, and, as such, will not be repeated here.

## III.    Sentencing Guideline Calculations

The PSR, as well as the Plea Agreement, calculates a Base Offense Level of 30. There is then a 2-level increase for use of a computer, a 2-level increase for a commercial sex act, and a possible 2 level increase for leader/organizer. There is also a 3-level decrease for acceptance of responsibility. Probation recommends that the Court impose the 2-level increase for leader/organizer and therefore reaches a total offense level of 33.  Singleton has objected and asks that the Court calculate the offense level at 31 instead of 33 but will herein submit on the matter.

Per Probation, Singleton's prior criminal convictions result in a criminal history score of 10 which places him in criminal history Category V. However, for the reasons set forth below, the criminal history score, while accurately calculated, is unfairly overstated.

## IV.    Booker Factors -- Circumstances Warranting a Downward Variance

Beyond what may be permissible under the guidelines, the history and characteristics of Singleton and other factors set forth in 18 U.S.C. § 3553(a)(2) support the requested 120-month sentence.  As set forth above, in fashioning sentences, courts are asked to impose a penalty that is "sufficient but not greater than necessary" to achieve the purposes of sentencing set forth in 18 U.S.C. §3553(a)(2).  Those sentencing purposes are:

(a)     retribution (to reflect seriousness of the offense, to promote respect for the law, and provided "just punishment");
(b)     deterrence;
(c)     incapacitation ("to protect the public from further crimes"); and

  (d)  rehabilitation ("to provide the defendant with needed education or vocational training, medical care, or other correctional treatment in the most effective manner").

(See *United States v. Carty*, 520 F.3d 984, 991 (9th Cir 2008))

In determining the sentence minimally sufficient to comply with the aforementioned purposes of sentencing the court must consider several factors listed in Section 3553(a). These factors are:

  (1)  "the nature and circumstances of the offense and history and characteristics of the defendant;"
  (2)  "the kinds of sentences available;"
  (3)  the guidelines and policy statements issued by the Sentencing Commission, including the (now non-mandatory) guideline range;
  (4)  the need to avoid unwarranted sentencing disparity; and
  (5)  the need to provide restitution where applicable.

(18 U.S.C. §3553(a)(1), a(3),(a)(5)-(7).)

Application of the §3553(a) factors and adherence to the §3553(a)(2) purposes to the unique circumstances of Singleton's case support the conclusion that a variance is warranted and a sentence below the PSR guidelines is appropriate and should be imposed.

  **A. Booker -- Relevant 3553 Facts/Facts in Mitigation**

*Background/Family*

There is no doubt that Singleton made poor choices, and he will pay the price for those poor choices. But there is also no doubt that he is the product of extraordinarily difficult and traumatic childhood that shaped his decision-making ability in a negative and profound way.

Born in Sacramento, California, Singleton was born to Debra Morrow (mother) and Charles Grime (father). Singleton was unaware that Mr. Grimes was his father until he was 9 years old. Instead, Singleton was told and believed his father was William Singleton, who was in a relationship with Singleton's mother and who acted as Singleton's father. For purposes of this memorandum, William Singleton will be identified as Singleton's father. Singleton's mother, Ms. Morrow, is 66 years old and

lives in Sacramento. She works providing in-home health care. Mr. Grimes died of cancer at the age of 46 when Singleton was 9 years old. Mr. William Singleton died in 2013-2014 of a heart-attack.

Singleton's childhood was challenging. When Singleton was very young his father moved to a separate residence. Singleton was then raised primarily by his mother. Unfortunately, Singleton's mother did not know how to raise her children without abuse. Singleton and his siblings were subject to frequent beatings with belts and even extension cords (although Singleton was the only child produced by the union of William Singleton and Debra Morrow, Ms. Morrow had two older girls and a boy from other relationships – these children are Singleton's half-brothers and sisters and were raised with Singleton by Singleton's mother). Although the abuse was reported to authorities by teachers several times, the children were never removed from the house.

Sadly, physical-violent abuse was not the only abuse young Singleton experienced. He experienced sexual abuse at a very tender age. When he was six years old Singleton was molested by an uncle. At the age of 14 he was subsequently sexually molested by an adult friend of his sister. Singleton's mother knew of the molestation that occurred when Singleton was 14 years old. Rather than put an end to the assault, she congratulated Singleton for having sexual relations with an older woman.

Singleton's difficult childhood was compounded by the fact that he and his family lived in poverty, which left them frequently hungry and living in dangerous areas. The family relied upon government assistance for housing and for food. The government provided food stamps, but the stamps were often insufficient to cover the costs of food and the family simply went hungry. The housing projects in which the family lived were dangerous and teeming with criminal activity. Singleton lived in the midst of drug dealers, gang members, pimps, prostitutes. It was from this exposure that Singleton began to learn hustling and criminal activity in order to earn money and make ends meet.

Although Singleton had experienced violence, molestation and want since birth, one of his earliest searing and shocking memories came when he learned at the age of nine that William Singleton

was not his father. Charles Grimes moved into the house and was introduced as Singleton's actual father. The shock was tempered by sadness. Mr. Grimes was mortally ill in the advanced stages of cancer. He was obviously ill -- weak and frequently vomiting. Still, Mr. Grimes made the most of the short time he and Singleton had together -- spending time with Singleton and playing basketball with him. However, the cancer quickly advanced and Mr. Grimes became sicker. Mr. Grimes left the home after only 2 weeks, only to die shortly thereafter.

The sudden appearance and death of Mr. Grimes threw Singleton into an emotional tailspin. It was Singleton's first experience with death. He experienced nightmares and became terrorized at the prospect of dying. It was at this time that Singleton began to believe he was fated to soon die, and he began to become both anxious and fatalistic. (See Abueg Report).

Although the death of Mr. Grimes was Singleton's first brush with death, it would not be his last. When Singleton was 15 years old his brother was shot. A year later Singleton was shot in the leg when he was the victim of a drive-by shooting. Later Singleton was the victim of a home invasion robbery, where he was pistol whipped and a gun was placed in his mouth. More recently friends of Singleton were murdered.

As explained in Dr. Abueg's report, these traumatic experiences damaged Singleton. He experienced post-traumatic stress disorder which resulted in poor executive functioning, anxiety, suicidal thoughts, a suicide attempt, and depression.

*Family*

Singleton married Ansarel Muhammad in 2016. Together they have one daughter, 4-year old Amiya Singleton. Singleton is determined to be a positive force in his daughter's life, though he admits that he has thus far failed to do so. She is a major impetus for his hope to reform himself and start fresh when he is released from custody.

Singleton has one half-brother, Damian Walton, who is 35 years old. He has two half-sisters, Detra Alfred, who is 45 years old, and Dabriah Maiden, who is 38 years old.

Singleton's mother resides in Sacramento. Despite the abuse he endured in his childhood, Singleton has maintained a good relationship with his mother. He remembers how hard she worked to provide for the four kids in her care. He is in frequent telephone contact with his mother, and she often visits him at the jail discussing religion and bringing him scriptures.

*Education*

Singleton attended Center High School in Antelope, California. He obtained a GED after attending school through Sacramento's juvenile hall education program.  Recently, while in custody, Singleton completed the Call to Men certification course, which he has also become qualified to teach.

*Employment*

Singleton worked for a period of time for Houdini's Landscaping in Sacramento (2009 – 2010). Although he enjoyed working for the company, he lost his job when the company went out business.

*Acceptance of Responsibility*

Singleton accepts responsibility for his behavior and actions in this case.  He has acknowledged to his family his mistakes and has forthrightly and completely accepted responsibility for his actions in this case. His hope is that he can in the future become a positive force in his daughter's life.

*Mitigation*

As stated *supra*, Singleton  does not shirk from accepting responsibility for his behavior in this case.  His actions were wrong, and he is very clear about that fact.  However, it is clear that Singleton has long been damaged as a result of the trauma he experienced as a child and later, and that damage

manifested in poor decision-making/executive functioning. Singleton has long needed help, and hopefully he will now obtain that help.

In the meantime, the price Singleton is going to pay for his actions here is excruciating. He is living with the knowledge that his family that he loves so much is going to be forced to adjust to life without his presence for a significant period of time.  He admits, however, without the intervention of this case and the treatment and help he is committed to getting in prison, he would not have been the father his daughter deserves.  He is committed to becoming that father one day.  He knows he is not that person right now.  Sadly, he also will not be present to protect his daughter from the negative influences that so scarred his childhood. He will miss so much, and he knows it.

*Mitigation: Criminal History Score Is Artificially Inflated*

As stated above, Singleton's Criminal History point score is 10.  More than half of those points, 6 of the 10, result from two 3-point convictions that occurred on the same date - November 16, 2016. Singleton was arrested on April 18, 2016 and held on at least three arrest warrants: two state court cases out of Santa Clara County, and one federal court case out of San Jose (the case at bench).  The state cases commenced but the federal case did not.  Recognizing this, Singleton made several attempts to be brought to federal court to initiate that matter as well.  Notably, while housed in Santa Clara County jail (with federal inmates), and when he was finally, many months later, brought to federal court, Singleton's housing remained unchanged. (See Inmate Grievance Forms reflecting some of the efforts filed under separate cover as Exhibit A.). Notwithstanding the propriety of the procedures, policies, and circumstances that led to the order in which his three pending matters were litigated, no sentencing goal is achieved by more than doubling his criminal history simply because the jailers took him to state court first and federal court second.

Moreover, by having the state cases go first Singleton was prejudiced in another arbitrary way. If the federal case had gone first Singleton would have started to get credit for time served from the date

8
DEFENDANT'S SENTENCING MEMORANDUM; REQ. FOR VARIANCE    /Users/michaelhinckley/Documents/Singleton sentencing memo Final.docx

of his arrest, and he would have likely been able to get the state sentences to run concurrent to the much longer federal sentence (a common state court disposition practice).

## V. A Sentence Variance Would Be Appropriate In This Case

As noted above, a guiding principle of any sentencing in the United States is to impose a sentence that is sufficient but not greater than necessary to comply with the purposes set forth in paragraph 2 of section 3553(a) of the sentencing codes.  These enumerated purposes include the nature and character of the offense; the history and characteristics of the defendant; the need for the sentence imposed to reflect the seriousness of the offense, promote the law, and to provide for a just punishment for the offense.  See 18 U.S.C. 3553(a)(2)

In this case, the requested lower sentence of 120 months would be sufficient but not greater than necessary to achieve the goals of sentencing.  While not enjoying custody, Singleton does enjoy and is excited about obtaining assistance through custody programs.  He has sought out education programs while in custody and is dedicated to learning more about his religion. He will continue to educate himself in prison.

## VI. Singleton's Request To Participate in Treatment Programs

Singleton is, of course, not the first sex offender to be sentenced to the BOP nor is he the first childhood victim of sexual abuse and youth violence to develop PTSD. The BOP offers Mental Health treatment programs as well as a number of specific Sex Offender Treatment programs.  Notably, the sex offender treatment programs are operated by psychologists, treatment specialists, and other qualified Bureau staff, and the programs are expressly designed as follows:

- Treatment programs that provide sexual offenders in Bureau institutions the opportunity to change behaviors, thereby reducing criminality and recidivism.

- Specialized correctional management practices to address behavior that indicates increased risk for sexual offenses upon release.
- Evaluation services to appraise risk of sexual offenses upon release and provide recommendations for effective reintegration into the community.
- Transition services for sexual offenders releasing to the community.

See (https://www.bop.gov/policy/progstat/5324_010.pdf).

It is clear that despite significant effort on his part while in custody, including his baptism and completion of the Call to Men certificate program, Mr. Singleton still has significant work to do. His underlying offense conduct, the inexplicable decision to make and publish the athlete rap video, and the equally inexplicable decision to attempt to continue in the sex industry in some fashion via monitored phone calls and FOI requests prove beyond any doubt that Singleton needed and continues to need significant help. Specifically, he needs to address in a therapeutic setting the impulsivity and executive malfunctioning that results from his PTSD, and to engage in sex offender treatment which addresses core causation issues and provides correctional management practice tools.

For these reasons Mr. Singleton respectful requests that the Court recommend that he be permitted to receive treatment in these BOP programs.

///
///
///

## VII.     Conclusion

For the above reasons, Singleton requests the Court sentence him to a custodial term of 120 months.

Dated:   September 3, 2019

                                                       Respectfully submitted,

                                                       LAW OFFICES OF MICHAEL HINCKLEY

                                                           /s/ Michael Hinckley
                                         By _____
                                                         MICHAEL HINCKLEY